**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| HEISHA LeGRANDE | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 2:21-cv-00078 |
| | : | |
| DOWNINGTOWN AREA SCHOOL | : | |
| DISTRICT; DOWNINGTON AREA | : | |
| SCHOOL AUTHORITY; and | : | |
| LIONVILLE MIDDLE SCHOOL | : | |

_____

<u>**BRIEF IN SUPPORT OF THE MOTION OF**
**DEFENDANTS, DOWNINGTOWN AREA SCHOOL DISTRICT,**
**DOWNINGTOWN AREA SCHOOL AUTHORITY AND**
**LIONVILLE MIDDLE SCHOOL,**
**FOR SUMMARY JUDGMENT**</u>

Defendants, Downingtown Area School District, Downingtown Area School Authority[1], and Lionville Middle School, by and through their counsel, Connor Weber and Oberlies, hereby submit the following Brief in Support of their Motion for Summary Judgment.

**I.**   <u>**MATTER BEFORE THE COURT**</u>

The Motion of Defendants for Summary Judgment.

**II.**   <u>**QUESTION TO BE DETERMINED**</u>

Should this Honorable Court dismiss all claims arising under 42 U.S.C. §1983 and the 14th Amendment against Defendants as Plaintiff has failed to elicit any evidence to support such claims?

**Suggested Answer in the Affirmative.**

---

[1] This is not an existing legal entity, as set forth in the Answer of Defendants to Plaintiff's Complaint.

III.   **FACTS**

A.  **Introduction**

This matter arises from Plaintiff's claim that, while working as an aide to special needs students, she was injured when one such student tripped her and caused her to fall. In her Complaint, Plaintiff alleges that Defendants "knew or should have known" that the student had "dangerous propensities, behavioral issues and violent tendencies," and that Defendants, violated her rights under 42 U.S.C. §1983 and the 14th Amendment to the Constitution. Plaintiff contends that this minor student who allegedly tripped her had a "long history of being violent toward students, teachers, aides and others in the school," and that Defendants should have warned her about the student's allegedly violent tendencies.

In so pleading, Plaintiff specifically contends that this particular student had a significant history of "tripping," and she was not warned that this student could potentially trip her prior to her accident.

This action was initiated by Plaintiff filing a Civil Complaint in this Honorable Court. Of note, Plaintiff did not report her incident to Defendants, who were unaware that this incident occurred until the media reported that a Complaint had been filed. The Complaint was filed on January 7, 2021. Defendants filed a Motion to Dismiss, based on the failure of the Complaint to allege sufficient facts to support a claim, on April 5, 2021. Plaintiff filed an Amended Complaint on April 19, 2021, alleging the same facts but removing claims arising under the 8th Amendment of the United States Constitution. A copy of the Amended Complaint is attached hereto as Exhibit "A."

On May 5, 2021, Defendants filed a Motion to Dismiss the Amended Complaint, again alleging that Plaintiff failed to provide sufficient facts to support her claims. Plaintiff's responded to the Motion on May 18, 2021.

On June 2, 2021, this Honorable Court entered a scheduling Order, setting a deadline to file Summary Judgment motions by August 19, 2021. This Honorable Court also held an initial pretrial conference in this matter on June 22, 2021.

On June 23, 2021, this Honorable Court entered an Order denying Defendants' Motion to Dismiss, but permitting leave to file for Summary Judgment to argue absence of evidence to support Plaintiff's allegations. A copy of this Honorable Court's Order is attached hereto as Exhibit "B."

Plaintiff has taken the depositions of David Matyas, Business Manager of Downingtown Area School District; Jonathan Ross, Principal of Lionville Middle School, Meghan Dennis, Director of Pupil Services, and Kelsey Mueller, who was the teacher in charge of the Life Skills classroom where this accident allegedly occurred at all times. The deposition of the Plaintiff has also taken place.

None of the testimony or evidence in this matter supports any of Plaintiff's claims, and therefore, it is respectfully submitted that summary judgment is appropriate at this time in favor of the Defendants.

**B.  Facts**

Plaintiff testified that she began working for Insight in September, 2019. She acknowledged that in her position as an aide, her role was to work with children with intellectual and/or physical disabilities. A copy of the transcript of Plaintiff's deposition is attached hereto as Exhibit "C." She contends that Insight provided no training to her to assist her in handling

children with these disabilities, other than "like CPR, first aid" training. See Exhibit "C," 24:9-15. She was first assigned to Bradford Elementary school to work with a student who "didn't speak," and testified that she remained at that position for approximately one month.

Plaintiff was supposed to begin work as an aide in the Life Skills classroom on November 11, 2019. Her supervisor, Emily Cardow, wrote to Lionville to advise that Plaintiff would not present on Monday or Tuesday of that week but would be present to fulfill her duties as an aide on Wednesday, November 13, 2019. Despite this assurance, Plaintiff did not appear as scheduled until Monday, November 18, 2019, resulting in significant difficulties finding substitute aides for the period she was out. Plaintiff did not advise anyone at Lionville Middle School that she would not be appearing as scheduled.

According to her testimony, Plaintiff was assigned to the life skills classroom, but not assigned to any particular student to her recollection. See Exhibit "C," 30:2-10. She testified that she did not ask anyone at her employer what "life skills" meant in terms of the types of students she would be assigned to aide prior to beginning work. Plaintiff testified that there were six students in the classroom and that she was assigned to sit with student "J." Of note, there were actually only four students within the classroom, and, in addition to Plaintiff, there were three other aides (Michael Griffith, Tina Golden, and Anne Peterson), as well as Kelsey Mueller who was present at all times.

Upon arriving to the classroom, she testified that she was "introduced to the classroom" and was introduced to J. Plaintiff denies that Ms. Mueller, the teacher in the room, had any discussion with her as to the nature of J's disabilities, and denies seeing J's behavioral chart which was posted both on his desk as well as on the wall to the classroom. See testimony of Kelsey Mueller, attached hereto as Exhibit "D," 61:5-15. Ms. Mueller did not recall a specific

discussion with Plaintiff, but testified that she would have reviewed all of the information "as practiced within her classroom." See Exhibit "D," 57:18-24.

Plaintiff testified that on the first day she presented, there were no issues involving J. On the second day, November 19, she testified that she witnessed J have an outburst in the classroom. Plaintiff testified that everyone was instructed to leave the classroom while J was having his outburst, which she contended lasted 45 minutes. She testified that Ms. Mueller called for additional assistance in the classroom, and several other individuals came. Plaintiff admitted that **she was never requested to intervene** with J during this outburst and was not requested to do anything other than remain in the room. See Exhibit "C," 39:1-15.

According to Plaintiff, she had a conversation with an unidentified teacher during this outburst who told Plaintiff that she felt "threatened" by J's behavior and that she was leaving the room so she did not "get hurt." See Exhibit "C," 42:5-17.

Of note, in Plaintiff's Complaint, she contends that she was told afterwards (after her event on November 20) "by those working for defendants that the student was 'very violent.'" See Exhibit "A," ¶19. When questioned about this allegation during her deposition, Plaintiff responded:

> Q:    Okay. So I guess my question is it says plaintiff was told by those working for defendants that the student was "very violent." Did anyone tell you that Jacob was very violent?
>
> A:    Just the one particular teacher. I don't know who she was.
>
> Q:    The teacher you are talking about, that was during the outburst on the 19th, prior to this accident?
>
> A:    Okay. You are saying after, no.
>
> Q:    This it [sic] what's in the allegations in the complaint. I am just trying to figure out where you got that information from. So the only other teacher that you – the only other person

who worked for Downingtown that you believe said that J was violent was the teacher that was in the classroom on November 19, prior to your incident. Correct?

A:     Correct.

See Exhibit "C," 105:10-106:3.

Despite testifying under oath that she was allegedly warned by an unidentified teacher prior to her alleged accident on November 20 that J was "violent." Despite this testimony, however, Plaintiff admitted that she never requested assistance with J, and she never told anyone that she felt uncomfortable with J despite "having concerns." Specifically, she testified:

Q:     And he did not injure you on November 19 in that outburst. Correct?

A:     Correct.

Q:     And another teacher was there and that teacher you said said that she left because she didn't want to get hurt. Is that correct?

A:     Correct.

Q:     At any point between that outburst and this incident where you contend he intentionally tripped you, did you say to Ms. Mueller or did you say to Ms. Mueller I don't feel comfortable working with J. I think he is going to be violent or I think he might hurt me?

A:     No.

Q:     Did you tell anyone at Insight that you didn't think you felt comfortable with J because you witnessed this outburst and you were afraid he might be violent?

A:     No.

Q:     Did you have any concern after witnessing the outburst and hearing what the teacher said, being that she left the room thinking she was going to be hurt, did you have any concerns that J was going to hurt you?

A:      I just – I mean, I just had concerns about how he was acting
        in the classroom. Yes, I did. I didn't say anything.

Q:      You did not say anything, though. Is that correct?

A:      Yes.

Q:      Did you ever ask Mueller for any additional help after –
        especially after witnessing that outburst that he had on the
        19th, just to make sure that she was always kind of with you
        or with J, or ask for any other help of any of the other aides?

A:      No.

See Exhibit "C," 107:4-108:15.

As to the event in question, Plaintiff contends that the day following this outburst,

November 20, 2019, she was in the cafeteria with J when he got up and "eloped." According to

Plaintiff, the other three aides were sitting at the lunch table with the other students, but Plaintiff

chose to go after J herself to attempt to bring him back to the table. She contends that she called

for Ms. Mueller, who was also in the cafeteria, and she came to assist Plaintiff. While Ms.

Mueller was present, Plaintiff contends that J tripped her and she fell to the ground. She contends

that at that point, another aide, Mike Griffith was also present. See Exhibit "C," 45:17-46:22.

Plaintiff indicated that after she fell, Ms. Mueller told her that "he trips people all of the

time." Id. Plaintiff did not claim to be injured as a result of this alleged incident, did not fill out

an incident report, and did not go to the nurse.

Kelsey Mueller testified that she taught J both in sixth grade and seventh grade, when

this incident allegedly happened. She does not recall this incident happening at all, and testified

that she did not ever leave J with Plaintiff alone, and that she "did not even leave J to go to the

bathroom throughout the school day." See Exhibit "D," 45:14-46:16. She was specifically asked

7

by Plaintiff's counsel as to someone telling Plaintiff that J was known for tripping people, and

she testified:

> Q:    If Ms. LeGrande testifies that following this incident a
>       teacher had indicated to her that J was known for tripping
>       people, you would have no knowledge of that, right?
>
> MS. JACOBELLI:       Objection to form. You can answer, Kelsey.
>
> A:    No knowledge. J did not trip. That was not a target behavior,
>       that was not something he did. He had episodes, you could
>       refer to them as tantrums. He did not trip people. That was
>       not something he did at all. He would hit you, he would kick
>       you, he would throw things, he would push things off desks,
>       but he would not trip you.

See Exhibit "D," 64:6-20.

She also testified:

> Q:    Did you know him to trip people?
>
> A:    No, that was not a behavior he engaged in at all. If he had an
>       episode, his episodes consisted of pushing or hitting, but
>       never tripping.

See Exhibit "D," 24:14-18.

Of note, Ms. Mueller (who again, had taught J for a year and half prior to this alleged

incident), described him as "smaller than the average sixth and seventh grader, much smaller."

She testified:

> Lets see, I'm five-three, so I would say he was probably around four-
> foot, maybe a little shorter in sixth grade, so around four-foot I
> would say and small stature, very small.

See Exhibit "D," 21:23-22:11.

This is in contrast to Plaintiff, who described J as "muscular" and almost as tall as her

(she also indicated that she was 5'3").

Plaintiff claims that J had a "long history of being violent toward students, teachers, aides and others in the school," that it was "foreseeable based on his past history that the student would attempt to trip and injury plaintiff, would act as he previously had multiple times as Defendants knew," that the history of this student included "purposefully causing significant injury to individuals as well as aides specifically," and that Defendants "knew the student would harm plaintiff."

When asked about these averments during her deposition, the only facts Plaintiff could claim to support these allegations were that Ms. Mueller told her after the event that J had a history of tripping, which is specifically denied by Ms. Mueller, and that another teacher told her **before the incident** that she was leaving the classroom so she did not get hurt.

Ms. Mueller was asked during her deposition whether she recalled any instances of J hurting anyone prior to November 20, 2019, and she testified that she did not. Specifically, she testified:

Q:     Pre November of 2019, do you recall anyone else, anyone, being injured by J's behavior? And by anyone I mean an aide, a teacher or another student.

A:     No.

See Exhibit "D," 68:21-69:1.

Ms. Mueller also testified that if anyone was injured by J's behavior, an incident report would be filled out and, whether or not the individual communicated that they were okay, if contact was made the individual would be sent to the nurse. Id, 69:2-70:11. Ms. Mueller testified that she did specifically went back to see if there were any reported injuries as a result of any of J's behavior prior to November, 2019:

> Q:    And did you go back and look to see if there were any
>       reported injuries from J's behavior prior to November of
>       2019?
> A:    Yes.
>
> Q:    And what did you find?
>
> A:    There were none.

Id., 76:14-19.

The testimony elicited in this case indicates that contrary to Plaintiff's averments in the Complaint, the student in question did not have any history of tripping and did not have any history of intentionally injuring anyone. Moreover, Plaintiff's own averments that she was not "warned" of potentially violent behavior from a small statured, intellectually disabled student are belied by her own testimony wherein she observed behavior on the day prior to her incident, allegedly overheard a teacher indicating she was afraid she would be hurt, and yet did nothing about her own concerns, including simply talking to the teacher physically in the classroom with her at all times.

It is submitted that Plaintiff can plead no facts, only unsubstantiated legal conclusions in this matter, and therefore can not prove a prima facie claim under 42 U.S.C. §1983.

## IV.    **LEGAL ARGUMENT**

### A.    **Legal Standard**

Pursuant to Federal Rule of Evidence 56, a party may move for summary judgment identifying each claim or defense on which summary judgment is sought. If the movant shows that there is no genuine issue as to any material fact, the court shall grant summary judgment as the movant is entitled to judgment as a matter of law. F.R.C.P. 56(a).

Summary Judgment is appropriate at this time pursuant to the Order dated June 2, 2021, of this Honorable Court, requiring any dispositive motions be filed on or before August 19, 2021.

**B.  Plaintiff Cannot Establish a Prima Facie Claim Under 42 U.S.C. §1983**

42 U.S.C. §1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage  . . . subjects, or causes to be subjected, any citizen . . . or other person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ."   "In general, §1983 does not itself create substantive rights, but instead provides a vehicle for vindicating a violation of a federal right." S.K. v. North Allegheny School District, 168 F. Supp. 3d 786, 807 (W.D. Pa. 2016), *citing* Groman v. Township of Manalapan, 47 F. 3d 628, 633 (3d. Cir. 1995). In order to assert a cause of action under §1983, a plaintiff must prove first, a violation of a right, privilege or immunity secured by the Constitution and laws of the United States, and second, that the violation was committed by a person acting under the color of state law. Id.

"To establish liability under §1983 a plaintiff must show that the defendants, acting under color of law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused the complained of injury."  Elmore v. Cleary, 399 F.3d 279, 281 (3d Cir. 2005).

With respect to the first element of proof, "the first step is to identify the exact contours of the underlying right said to have been violated." Id., *citing* County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5, 118 S. Ct. 1708, 140 L.Ed.2d 1043 (1998).  The Third Circuit Court of Appeals has recognized that "[i]ndividuals have a constitutional liberty interest in personal bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment." Phillips v. Cnty. of Allegheny, 515 F.3d 224, 225 (3d Cir. 2008). However, as noted by the Middle District of Pennsylvania noted that "[g]enerally, the Due Process Clause does not impose an affirmative duty upon the state to protect citizens from the acts of private individuals." Bridges ex rel. D.B. v. Scranton School Dist., 66 F.Supp.3d 570, 580 (M.D. Pa. 2014), *citing* Sanford v. Stiles, 456 F.3d

11

298, 303-04 (3d. Cir. 2006). As this Honorable Court has recognized, "it is well established that the Due Process Clause does not impose an affirmative obligation on a municipality to protect its citizens from private acts of violence." Dubrow v. City of Philadelphia, p. 4 (E.D. Pa. 2008) 2008 WL 4055844. As held further by this Court:

> In DeShaney, the United States Supreme Court stated that the Due Process Clause of the Fourteenth Amendment is a "limitation on the state's power to act, not …a guarantee of certain minimal levels of safety and security." 489 U.S. at 195. The intended purpose of the Due Process clause is to prevent the government from abusing its power over private citizens; its purpose is not to ensure that the state protects private citizens from one another. Id. At 196 ("[The Due Process Clause's] purpose was to protect the people from the State, not to ensure that the State protected them from each other."). I note that both the Supreme Court and the Third Circuit have repeatedly cautioned federal courts to exercise utmost restraint when asked to recognize individual rights under the Due Process Clause that extend beyond its intended purpose. *See e.g.* DeShaney, 489 U.S. at 195; Collins, 503 U.S. at 125; Bennett v. City of Philadelphia, 499 F.3d 281, 287, 289-90 (3d Cir. 2007); Kaucher v. County of Bucks, 455 F.3d 418, 428 n. 5 (3d Cir. 2006).
>
> It is also well established that the Due Process clause does not impose an affirmative obligation on municipal employers to provide a safe working environment for municipal employees. In Collins v. City of Harker Heights, the Supreme Court explained that state law, rather than the federal Constitution, generally governs employment relationships, and failures on the part of government employers to provide a working environment "free of unreasonable risks of harm" is government by state tort law, not the Due Process Clause. The Supreme Court has also explained that "Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of care arising out of tort low. Remedies for the latter type of injury must be sought in state court under traditional tort-law principles." *See* Baker v. McCollan, 443 U.S. 137, 146, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979). Hence, conduct by a municipal employer that is merely negligent may be actionable in a state forum, but it cannot form the basis of an award of damages under 42 U.S.C. §1983. *See* Baker, 443 U.S. at 138-47.

Id. at 4-5.

Two exceptions to this rule have been recognized: where a "special relationship" exists, or when a "state created danger" is involved. Plaintiff does not plead a special relationship exists and therefore, the allegations most closely resemble a state created danger claim. The state-created danger theory is an *exception* to the general rule that the state is not required to protect citizens from harm; it applies when state actors acted affirmatively either to expose a plaintiff to danger, or render him more vulnerable to harm.  Bright v. Westmoreland County, 443 F.3d 276, 281 (3d Cir. 2006).

The Third Circuit has "recognized that a state actor may be held liable under the 'state-created danger' doctrine for creating a danger to an individual in certain circumstances." Morrow v. Balaski, 719 F.3d 160, 176 (3d. Cir. 2013). To prevail on a theory of state-created danger, Plaintiff must prove: 1) the harm ultimate caused was foreseeable and fairly direct; 2) a state actor acted with a degree of culpability that shocks the conscience; 3) a relationship between the [district] and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subject to the potential harm brought about by the state's action as opposed to the public in general; and 4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all. Id. at 177.

The first element of a state created danger claim is that the harm that was ultimately caused was a foreseeable and direct result of the state's actions. Plaintiff alleged in her Complaint that it was foreseeable that she would be injured while serving as an aide in the subject classroom, because the student at issue had a specific history of violence towards aides and other individuals, had a history specifically of tripping other individuals, and had a history of significantly injuring other individuals.

Plaintiff's averments have not been substantiated by the testimony in this matter. In fact, the only testimony that Plaintiff has offered to substantiate her claims is that she was told by Kelsey Mueller subsequent to the alleged incident that J had a history of tripping. Ms. Mueller gave her deposition testimony prior to that of the Plaintiff, and therefore could not specifically refute this claim, but she did testify that J had never had a history of tripping. She specifically testified:

> Q:    If Ms. LeGrande testifies that following this incident a teacher had indicated to her that J was known for tripping people, you would have no knowledge of that, right?
>
> MS. JACOBELLI:    Objection to form. You can answer, Kelsey.
>
> A:    No knowledge. J did not trip. That was not a target behavior, that was not something he did. He had episodes, you could refer to them as tantrums. He did not trip people. That was not something he did at all. He would hit you, he would kick you, he would throw things, he would push things off desks, but he would not trip you.

See Exhibit "D," 64:6-20.

She also testified:

> Q:    Did you know him to trip people?
>
> A:    No, that was not a behavior he engaged in at all. If he had an episode, his episodes consisted of pushing or hitting, but never tripping.

See Exhibit "D," 24:14-18.

Moreover, Ms. Mueller testified that she went to examine whether any injuries had been reported as result of J's behavior, and found none. This is consistent with the testimony of Principal Jonathan Ross, who testified:

> Q:    Do you recall anyone ever having been – prior to November of 2019, do you recall ever hearing a report of anyone being injured by J, I said prior to November of 2019, horrible question, but do you ever recall hearing a report that anyone was injured by any behavior of J prior to November of 2019?

14

A:     I dot [sic] not.

Q:     If somebody was injured prior to November of 2019 by a behavior of J, is that something that would have been brought to your attention as principal of Lionville Middle School?

A:     It would have been, yes, because the practice in our school is that when someone is injured by a student, they are directed immediately to the nurse who then completes a report that I sign.

See transcript of the deposition of Jonathan Ross, attached hereto as Exhibit "E," 38:3-21.

There is similarly no evidence, other than Plaintiff's bald legal conclusions, that Defendants intentionally placed her in a situation knowing she would be injured. To the contrary, Ms. Mueller testified that Plaintiff was **never left alone with J**; Ms. Mueller was always with J. Plaintiff's own testimony admits that she was not requested to assist in restraining J at any time.

Ms. Mueller testified that on the first day Plaintiff came to the classroom, she put in a request that she received Safety Care (or Crises Intervention) certification. She explained that if Plaintiff was going to remain in the classroom, and if she was going to be assigned to J, she would have wanted that certification in order to assist Ms. Mueller should assistance be needed. However, she testified that Plaintiff **did not work alone with J** during the three days she was actually at Lionville Middle School. Ms. Mueller specifically testified:

Q:     So you understood that Ms. LeGrande was assigned to the school, that she was assigned there to – assigned to J, correct?

A:     That was the intention, yes, however I was with J during the month of November until March of 2020, November of 2019 to March of 2020.

Q:     Well, when this incident occurred with Ms. LeGrande, do you know why you were not there?

A:     I believe I was present. I did not leave J. I did not even leave J to go to the bathroom throughout the school day. I was with J

from the moment he got off of a bus to the moment he got on
a bus to go home.

See Exhibit "D," 45:3-19.

Plaintiff's own testimony does not indicate that she was ever left alone with J, or that she was ever asked to or expected to intervene with J at any time.

In short, there is nothing in any of the testimony to remotely suggest that Defendants intentionally did anything to put Plaintiff in a position of harm.

There is further nothing in the testimony to suggest that any of Defendants' alleged actions rose to the level of shocking the conscience, a necessary element to establish liability under a §1983 claim. The second factor necessary to establish a state created danger theory is that the state actor, in this case, the School District and Middle School, must have acted in such a manner which "shocks the conscience." As noted by the United States District Court for the Middle District of Pennsylvania, in order for conduct to "shock the conscience" in a public school setting, the conduct must be performed with "malice or sadism." *See* K.A. ex. Rel. J.A. v. Abington Heights School Dist., 28 F.Supp.3d 356, 373 (M.D. Pa. 2014). As explained by the Supreme Court of the United States, the "constitutional concept of conscience shocking duplicates no traditional category of common law fault, but rather points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability." County of Sacramento v. Lewis, 523 U.S. 833, 848 (1998).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.D. 662, 678, 684 (2009). Though Plaintiff's Complaint alleges that the actions of the Defendants "shock the conscience," there is nothing in the testimony elicited to remotely suggest that Defendants in any manner acted with "malice or sadism" towards Plaintiff.

16

As set forth in the Motion to Dismiss, while there may have been some risk that the particular student to which Plaintiff was assigned or, to that end, any of the special needs students requiring one-on-one aide support could act out in some manner causing injury, at most the failure to warn Plaintiff that a particular special needs student had acted out in the past was negligent, but not deliberately or recklessly indifferent. This is further supported by the fact that this particular student was never left alone with the Plaintiff. Moreover, while there is testimony supporting that J had outbursts which were characterized by hitting, spitting, and throwing objects, there is no testimony to establish that J had any history of intentionally injuring anyone, and no support for Plaintiff's contention that J had a history of tripping.

Moreover, Plaintiff's claims that she was not warned of any alleged violent behavior prior to November 20 are belied by her own testimony, wherein she contends that she witnessed an outburst of J. Consistent with the testimony of Ms. Mueller, Plaintiff testified that when J had an outburst, everyone was requested to leave the room and a team of individuals were brought in to de-escalate his outburst. Plaintiff was not requested to in any manner attempt to restrain J or de-escalate the outburst.

Notwithstanding the fact that Plaintiff was not requested to nor expected to assist in any manner with J during an outburst, Plaintiff testified that she had concerns on November 19, the day prior to her alleged incident, regarding J's behavior. Nonetheless, she did not request to be assigned out of the Life Skills classroom. She did not raise concerns with Ms. Mueller. She did not raise her concerns with her employer. She did not seek additional help, and at no point did she request not to be around J.

Plaintiff's own testimony therefore is contrary to the allegations in her Complaint.

The third prong requires that the plaintiff be a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjects to the potential harm as opposed to a member of the public in general. As indicated, Plaintiff was one of four aides in a classroom of four students, together with a teacher, Ms. Mueller. Ms. Mueller's sworn testimony was that J was never alone with Plaintiff, a fact which is not disputed by Plaintiff herself. Plaintiff was not part of the team assigned to calm J down during an outburst, nor was she expected or requested to help during any such outburst. At most, Plaintiff can assert that she was one of five adults in a room wherein J was one of four minor students. In that J's behavior had never resulted in injury to any other aide, Plaintiff has not established any evidence to satisfy this prong of a state created danger claim.

The fourth and final requirement of a state created danger theory requires that the state actor affirmatively used his or her authority in a way that created a danger to the citizen that rendered the citizen more vulnerable to danger than had the state not acted at all. To this end, the only averment in the Complaint suggesting any "affirmative action" by Defendants is Plaintiff's unsupported contention that Defendant "intentionally" placed her in a position knowing she would be harmed. For the aforementioned reasons, it is submitted that none of the testimony or evidence remotely suggests that Defendant in any manner affirmatively acted to place Plaintiff in a position where she was more vulnerable than had Defendants not acted at all. In D.R. by L.R. v. Middle Bucks Area Vocational Technical School, 972 F.2d 1364 (3d Cir. 1992), the Third Circuit held that plaintiffs failed to assert facts that would support a theory of state created danger, as plaintiffs failed to assert any facts to support any affirmative action on the part of the school created any danger to the plaintiffs. In D.R., two minor female students alleged that, while students in a graphic arts class at Middle Bucks, they were physically, verbally and sexually assaulted by several male

18

students. Plaintiffs alleged that the school was liable for not providing supervision for the teacher in the classroom at the time. The Third Circuit held "[l]iability under the state-created danger theory is predicated upon the states' affirmative acts which work to the plaintiffs' detriments in terms of exposure to danger." Id. at 1374. The Third Circuit concluded that it was convinced that the school defendant neither caused the peril of the plaintiffs, nor did it increase their risks of harm or act to render them more vulnerable to the assaults of the other students.

In Lansberry v. Altoona Area School District, 318 F.Supp.3d 739 (W.D. Pa. 2018), the United States District Court for the Western District of Pennsylvania reached a similar result. In Lansberry, the father of a student who committed suicide as a result of being bullied brought an action against the school district alleging, among other claims, that the district was liable under a theory of state created danger. Plaintiff claimed that the minor student was bullied in the presence of the high school staff as well as other students, and that though it was well known that he was being bullied, the school did not take any disciplinary measures against the bullies.

In dismissing the claim that the district was liable under a state created danger, the court noted that plaintiff had failed to plead any affirmative action on the part of the school district that harmed the plaintiff or made him more vulnerable to the bullying. The court noted that the "affirmative act requirement 'ensures that defendants are only liable for misuse of state authority, rather than a failure to use it.'" Id. at 755, citing Gayemen v. Sch. Dist. of City of Allentown, 712 F. App'x 218 (3d Cir. 2017).

No evidence has been established to suggest that Defendants in any manner affirmatively acted in such a way as to increase Plaintiff's risk of danger. Therefore, it is suggested that the fourth prong of a state created danger claim cannot be satisfied.

Finally, in that the Complaint seeks to make a claim under a theory of municipal liability, citing to unidentified and unspecified polices, regulations, procedures and/or training that Plaintiff contends were "unconstitutional," Plaintiff has failed to establish that any policies or procedures caused or contributed to Plaintiff's alleged incident.

To prove municipal liability under Monell for §1983 violations, a plaintiff must establish the following: "(1) the municipality had a policy or custom that deprived the plaintiff of his constitutional rights; (2) the municipality acted deliberately and was the moving force behind the deprivation; and (3) the plaintiff's injuries were caused by the identified policy or custom." Id. Plainly stated, TESD can be held responsible for the constitutional violation of an employee only if the violation occurred as a result of a policy, custom or practice established or approved by TESD. See C.H. ex rel. Z.H. v. Oliva, 226 F.3d 196 (3d Cir. 2000).

To prevail on such a claim, Plaintiffs must demonstrate that the violation of rights was caused by a policy, custom, or practice of the municipality. Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996). A *policy* exists when a "'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." Watson v. Abington Township, 478 F.3d 144, 155 (3d Cir. 2007). A *custom* may be established "by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Id.* at 155-56. In determining who has policymaking authority, the court should look to state law in order to "determine which official has final, unreviewable discretion to make a decision or take an action." Id. at 156. Alternatively, "an employee who lacks policymaking authority can still bind the municipality if a municipal policymaker delegated power to the employee or ratified his decision." Kelly v. Borough of Carlisle, 622 F.3d 248, 264 (3d Cir. 2010).

To summarize, the Third Circuit has outlined three circumstances in which municipal liability will attach under §1983:

> First, the municipality will be liable if its employee acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity; second, liability will attach when the individual has policy making authority rendering his or her behavior an act of official government policy; third, the municipality will be liable if an official with authority has ratified the unconstitutional actions of a subordinate, rendering such behavior official for liability purposes.

McGreevy v. Stroup, 413 F.3d 359, 367 (3d Cir. 2005) (internal citations omitted).

Plaintiff's claims in this case stem from her allegations that Defendants were aware that the particular student who allegedly injured her on November 20, 2019, had a history of intentionally injuring people through tripping, specifically aides, and that Defendants intentionally placed her in a situation knowing she would be injured, and failed to warn her of any potential violent tendencies.

Monell and its prodigy are clear that only those municipal officials who have final policymaking authority may subject the government to §1983 liability.  Id. With regard to Plaintiff's claims against Defendants, municipal liability under §1983 is limited to those circumstances in which the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."  Id.  The plaintiff must show the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.  Board of County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397 (1997).

Plaintiff has presented no evidence, nor can she present any evidence, that the alleged incident of November 20, 2019, was the result of some municipal action. At most, all that Plaintiff can show is that a small, middle school intellectually disabled student accidentally tripped her

while she was trying to get him back into a classroom. Such evidence does not rise to a claim under §1983, and therefore, it is submitted that all claims should be dismissed with prejudice.

**V.      CONCLUSION**

For the aforementioned reasons, Defendants, Downingtown Area School District, Downingtown Area School Authority, and Lionville Middle School, respectfully request that this Honorable Court enter the attached Order, dismissing all claims against Defendants with prejudice.

Respectfully Submitted,

CONNOR, WEBER & OBERLIES

By:___*Julia M. Jacobelli*_____

Julia M. Jacobelli, Esquire
Connor, Weber & Oberlies
171 West Lancaster Avenue
Paoli, PA 19301
(610) 560-0972
(610) 640-1520 – fax
Email: jjacobelli@cwolaw.com
Attorney ID No. 309467

Attorney for Defendants,
Downingtown Area School District,
Downingtown Area School Authority, and
Lionville Middle School